v. Flacca Properties, LLC v. City of Buffalo, et al. Good morning, Mr. Kintel. Is that how you pronounce it? Yes, sir. You have two minutes for rebuttal. You can begin whenever you're ready. Thank you. Good morning, Your Honors, and may it please the Court. This case is about the City of Buffalo's extraordinary act of demolishing a private home with no notice, no hearing, and no emergency, and then attempting to avoid accountability by labeling it as an emergency after the fact. I'll address this case through three points. First, there was no emergency. Second, neither qualified immunity nor Monell should in- Isn't the question of whether there was an emergency or not a fact question? It is, Your Honor. Yeah. And we don't have a factual determination here of that unless you say there's only one possible way of viewing the facts, and it would be unreasonable for a jury to find otherwise. That's correct, Your Honor. On the lower court's decision, they found that the procedural due process claim was dismissed because there was an emergency that made the procedures provided by the City of Buffalo appropriate in those circumstances. That was incorrect. The lack of emergency here, as demonstrated by the- It seemed like the district court was saying, because the report and recommendation found that there were disputed facts on whether or not there was an emergency or not. It seemed like the district court was saying, like, the district court didn't seem to address that. It seemed to say, well, the notice was sufficient anyway. Am I misunderstanding what the district court said? The district court seemed to say, like, even if it wasn't an emergency, the notice was sufficient. Isn't that what the district court said? I didn't see anywhere where the district court said, I disagree with the judge's conclusion. Well, I think the inference is, absent an emergency, there has to be a pre-deprivation hearing, and there was not one here, and the district court said that that was appropriate. So the only- So you're saying the district court focused on notice and said there was notice, but you're saying notice isn't enough. There would have to have been a hearing. That's what's required under Burtnick's, under de Blasio, under Catanzaro. If there is no emergency, then there has to be a pre-deprivation hearing. The only way you can allow yourself post-deprivation relief or an Article 78 as being sufficient process is if there is an exigency or an emergency. And here there just was not one, or there's significant issues of fact suggesting there was not an emergency here. Most know that- Well, that's a little different from what you just said, significant issues of fact suggesting that there was not an emergency. Right. That means that there may have been an open question about whether there was an emergency. And I misspoke. The record is clear, almost chapter and verse, the same way that Burtnick's was decided, that where there was a three-month delay from the last time an inspector reviewed any sort of home-related issues to when the emergency demolition occurred, and they said that that was not an emergency. Same applies here. There was no actual notice, that is, written notice. Is that correct? But I understand that the spouse of your client was notified, and the lawyer was notified before the demolition. Is that right? That's right, Your Honor. In August, after the housing inspectors or DPIS inspectors went to 393 Hampshire, a letter was sent to Mr. Levin's spouse, and there was a conversation with his attorney. However, there's nothing on the record that suggests that Mr. Levin's spouse was authorized to receive service of process on his behalf. There's nothing that suggests, even though they're part of the same LLC, that just being a member of an LLC doesn't give you the authority to accept service of process or waive any constitutional rights. Same is true with the attorney. You're saying the notice to the lawyer wasn't sufficient? Notice to the lawyer consisted of just a conversation with the lawyer, is my understanding. Are we going to tear your building down in two weeks unless you address this problem? I'm sorry, Your Honor. Are we going to tear the building down in two weeks unless you're going to address this problem, Counselor? Do you think that your position is that it's inadequate notice? Well, one, there's nothing in the record to suggest that the attorney was retained for this specific property. He had a relationship with Mr. Levin that was extant of this property. He handled Mr. Levin's business in Landlaw 10. Correct, Your Honor. Right. Your argument before was that even if that constitutes notice, you still have to have a hearing. That's exactly what I was going to say. It's a formative obligation on the lawyer to do something. Absolute emergency, there would have to be a hearing, right? That's exactly what I was going to say. He could go in and get an injunction or he could just talk to the town and say, you've got to hold up. We wrote a hearing here. But to put the onus then on the landowner to pursue an Article 78 or some other. . .  On the lawyer whose business it is to deal in those sorts of matters. But, again, absent a pre-deprivation hearing with no emergency, that. . . Well, we're talking about notice now, not necessarily a hearing. Your position is that notice is per se inadequate. The notice was insufficient. And then beyond that, absent a pre-deprivation hearing, even if the notice was sufficient, placing the onus on a landowner to say, well, just pursue an Article 78 proceeding, that would negate all of the emergency exception case law like Catanzaro and Burtnick's and de Blasio. That would make that all meaningless. Let's look at some of the other defendants in this case. The city, the individual defendants, were the case that was discussed on the basis of qualified immunity. Is that right? That's right. And you're contesting that? We already are. Because in 2019, at the time, the case law was clear. And these officials were assumed to know the state of the law, assuming that it's clear and not ambiguous. And under Burtnick's . . . But how would they know whether there was . . . Would they definitely know whether there was an emergency or not? Or was that an open question? It seems to me that these individuals, the state demolished the city, demolished the building based upon drug use and various other structural deficiencies, and that the individuals who were responsible, I'm not talking about the guy who ordered it. Commissioner Comerford. But the other individuals that were sued, how were they definitely aware that this was a problem? I think the timeline matters here, so I'd highlight a couple of key dates. The demolition was late September of 2019. The last time there was a structural inspection of the home was in 2017, two years prior to the demolition. And yet it was demolished because of some emergency about structural concerns with the house, along with the drug-related issue. I know, but these people had various touch points with the house at different times, so they wouldn't have had the complete picture. The only person who had the complete picture who made the decision was the commissioner, right? Well, from the start, both Inspectors Krug and Coyne were aware of this home. Through their deposition testimony, they both testified to the same. Who was the one who visited in 2019, right before the decision to demolish it? I believe that was Inspector Coyne. So the other inspector wasn't even there at the time the decision was made. How would he know whether or not in 2019 there was an emergency or not? He was the one who did the inspection in 2019, right? Well, in 2019, there was no inspection. There was no structural inspection. They looked at the rain gutters and the roof. Those aren't structural issues. The commissioner who looked at, and maybe he looked at old things, he looked at things from 2015, 2017, the commissioner made the decision, we're demolishing this now, in addition to receiving information that there was a drug overdose. But it's a different question of whether everybody then who did anything at that house, in terms of visiting it, looking at it, is responsible for that decision or not, right? Right, but the house was demolished with no inspection. This is an office for blight and abandoned homes of three inspectors. There was a structural inspection in 2017 and then never again. You're missing my point. My point is if several inspectors go there over time and see various things and make various conclusions, but the person making the decision to demolish was the commissioner, why should each individual inspector be held responsible for that decision? Because they provided the information that informed the commissioner. The information is not the violation. It's not the violation here. It's the decision to demolish without a hearing. They didn't make that decision. That was the commissioner's decision, right? Right. All right. I apologize. The follow-on question to that is the case was thrown out also for lack of Monell liability, and yet the commissioner is the commissioner. He's the guy. He's the policy guy. His orders are policy, and it seems to me that, therefore, there could be liability on the part of the city. That's exactly right, Your Honor. I think the lower court, both at the magistrate judge level and the district court level, just fundamentally misunderstood what policy means and how that's defined. I think it was interpreted as more of a generally broadly applying policy akin to monetary or fiscal or foreign policy where Pembauer makes clear that the decision of a single policymaker is policy. And I think they just missed that at the lower court level. So Counts 3 and 7, the takings and seizure counts, were both dismissed based on Monell liability, which was also Count 10, and we believe that should be reversed and remanded. All right. So is it your contention that this building was not structurally unsound and in danger of collapse? That is our position, and it's supported by the testimony and the opinion of the architect hired by appellate that stated just as much, that this house, though it was certainly not going to be on better homes and gardens at the time, was not a structural risk of falling down. I'm sorry. Did it have in-place windows? Some of the windows were replaced, and there were permits provided for that. Other windows were, at the time, boarded up with plywood and sealed. But they never took the position that anything on the exterior of the home was the basis for the demolition. It was the interior of the home and the drug use, essentially, that they pointed to, right? That's right. They pointed to things that were years-old pictures, that there were flammable materials in the house two years ago, and that somehow justifies the demolition of the home.  Let's hear from them, and you have your two minutes to move on. Thanks. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. On that last point, the windows are structural, Your Honor, so that was referenced as one of the basics. They said the decision to demolish was not based upon anything on the exterior. Am I incorrect about that? I think that's one of the arguments that plaintiffs were making, but if you look at the actual . . . I don't know if it was the arguments. I think it was testimony by someone. Yeah, I think the testimony was there were structural issues, and I think the testimony included windows as structural issues. Well, if there were structural issues from 2015 to 2017, what was the emergency that led to the demolishment, even though there was a hearing like two weeks away? Yes, I don't want to lose sight of the fact that someone died here. So if we look at this . . . The death didn't create the structural emergency, right? The death was caused . . . That also wasn't the complete basis for the demolition. It was both, and my understanding is that they don't stand alone. You don't have two separate bases for demolishing. The commissioner took into account A and B together was the demolition. Isn't that right? I think that's right, Your Honor, and that gets to the main point that you sort of raised at the beginning as to whether or not there is a question of fact as to an emergency. And what I would submit is that you have to look to whether or not that question of fact is material, and materiality requires that we look to the applicable law. The applicable law says that that's a decision for the commissioner to make. That is not a decision that we can sit here respectfully some five to six years later and make an argument about. You mean it's off the table as far as even a jury question, whether there's an emergency? Not in every circumstance, Your Honor, and I'll point to the 2025 case that is cited in the appellant's papers, the McIntosh v. Madison bill. So in that case, there were actual factual disputes. In that case, we had that relatively same 30-day window. Now, I would submit that our window extends back to 2015, but within that 30-day window in McIntosh, they were submitting allegedly phone calls and letters and going out and getting estimates and things like that, which the city in that case denied. So in that case, you've got a question of fact. You've got disputed questions, which one side is saying one thing, the other side is saying another thing. Here, there is no real dispute here. There is a dispute. Let's put aside the drug overdose for a minute. On the structural issues, the dispute is they have an architect who's examined the interior of the home and said there was no structural issue. So that's a factual issue. I know you say, well, they didn't submit that to the commissioner, so he didn't know, but they point to the fact that there was no updated information about the structure beyond the last time the inside of the building had been inspected. You can correct me if I'm wrong. It was 2017, right? That was the last time someone from the city went into the building and looked at the interior structure. Yes or no? No. John Stevens, there's an affidavit. Now, he was not the inspector on the demo piece. He was not one of the slum and blight guys, but he was the inspector assigned to the permit that was pulled by the plaintiff, and he testified that in 2017 and 2018, he did do an interior inspection, and he determined that no substantive work had been done to address the substantive issue. The point is that in 2019, when the demolition decision, there was no additional information regarding the structural issues that would have let the commissioner say, now it's an emergency and we can't wait two more weeks for the hearing, right? There was no updated information. The only updated information was that there was, and I say only, I understand the significance of it, but the difference was that there was a drug overdose, right? If there was no drug overdose, wouldn't there be an issue of fact as to whether or not it was necessary to destroy that building immediately? If, respectfully, if the plaintiff had come in and said, here's the work I did, here's the photographs I did from 2015, 2017, this building did not fix itself over time, Your Honor. So I think there is definitely a difference between whether or not there's an emergency that requires it to be destroyed immediately rather than wait two weeks as opposed to whether or not there's been repairs to what was structural damage. Those are two different issues. Do you agree? I don't know if I followed the entire question, Your Honor. I'm sorry. The question here is not whether or not they fixed the structural issues that were identified back in 2015 or 2000. The question is, was there an emergency regarding those structural issues that two more weeks couldn't be waited for the hearing that was already scheduled? That's the issue. It's not just whether they repaired the previously existing structural problems. I would submit that that is not the issue, Your Honor. The issue is whether or not the commissioner abused his discretion for the purposes of a due process claim and the other claims that are being alleged. I understand that. But the question is whether he abused his discretion to determine that there was an emergency, right? Yes. That's what he did determine, yes, Your Honor. He determined it, but why wasn't it an abuse of discretion if, in fact, the building had stood there for years and really hadn't, as far as we could tell, although repairs hadn't been made, disrepair wasn't shown, further disrepair. In other words, it was in the same condition it was months before or years before. So, therefore, if it wasn't an emergency then, why was it an emergency now? Well, it was an emergency then, and that is set forth in the emergency demolition order that was determined by Judge Carney in 2015. Yeah, but nothing happened, and that was never pursued by the city. I don't believe that that creates a material question of fact as to emergency. Respectfully, I think if there was some evidence that this was not in a deteriorated condition. The fact that a municipality, for whatever reason, including, you know, monetary, not having the resources, wanting to give people the due process that it is afforded, decided not. The due process that was afforded, there's a real question about that one. You know, that's what we're fighting about now. I think we're fighting about a lot, Your Honor, but yeah. The whole reasonable inference is in their favor. Maybe there's other reasons that the city didn't act on it, maybe for resource purposes or whatever, but isn't a reasonable inference that they didn't act on it for four years because they didn't deem it to be an emergency? Isn't that one reasonable inference that could be drawn? I don't think so, Your Honor, and if you look at the testimony of Krug, Inspector Krug, he testified that in 2016-17, when the property was going to be sold, he told the people that were going to buy the property, here are the things that you have to do to fix it. So it's clear that the emergency, the condition, was never abated. It was never addressed. It was just that the city, for whatever reason, in action. You're making arguments in your favor, and he's making arguments in his favor, but it does seem to me that this is an open question in this case. Was there an emergency? Was it an abuse of discretion for the commissioner to decide that this was an emergency under these circumstances? I would say two things. I don't think there's evidence in the record that supports that, and the second being that when you look at this in the context of a qualified immunity analysis, I do think that changes things, and to some extent, I believe that's what the district court was looking at this through, is whether or not it was unreasonable for the commissioner to determine. Why wouldn't there at least, with respect to the commissioner, be a claim against the city because, as Judge Walker pointed out, the commissioner is the final policymaker on this, right? So I believe that the claims against . . . Qualified immunity doesn't kick in under those circumstances. If it's just the city, is the defendant a viable defendant? Well, I would submit that that case does not stand for the fact that every time a commissioner makes a decision that there is, you know, potential for municipal liability. You look to the underlying rationale behind this. Was this a policy decision? Was this something larger that the city should be responsible for? Or was this a decision made by a commissioner based on the facts that is no different than the other cases that dealt with similar facts where it wasn't a commissioner, it was someone else? It's the same decision. It's the same rationale. The question is, is it a policy . . . Isn't it a policy question as to whether where there is a substantial period of time the building has not deteriorated further that all of a sudden there's a . . . I can say it's an emergency whenever I want to. That seems to be a policy question. I don't think you can say whenever you want to, Your Honor, because there are rationales set forth both in the case law and in the city charter and code which talk about the things that you're supposed to look at. And one of the things that he looked at and one of the things he testified that he looked at was the health and safety of the neighbors. But that goes to the question of whether the building should be demolished, not the question of whether it's now an emergency that it be demolished now without providing a hearing. I think when you look at this in the context of the qualified immunity, though, that's when you really do get to whether or not a hearing was required and whether or not a hearing was, in fact, provided. Because if you look at what actually happened there, and I think it is a relatively unique circumstance where you have a housing court attorney who was involved in these things. And if you look at some of the back and forth in the transcripts for the subsequent proceedings, it's clear that there was a relationship here and that these folks knew each other and they talked to each other. And what the commissioner talked about was he would have held off had they come forward. Essentially, they were asking for a hearing. Here's how you do it. We're in housing court. We already got a housing court order where it's not a demolition. You don't have an affirmative obligation to do what you're suggesting. If there is not an emergency, you're entitled to notice and a pre-deprivation hearing. Isn't that the law? You're certainly entitled. I believe the pre-deprivation hearing is amorphous is not the right word. It depends. The type of hearing that is held is different in each circumstance. Well, there's no hearing here. You're suggesting that notice alone is sufficient. There is no case that I can find anywhere that suggests that if there's not an emergency, just notifying them, hey, we're knocking your building down, satisfies the pre-deprivation process due process. Which case would you cite that just notices enough and is not a hearing? I mean, that's not an emergency. The case, the 2025 case, McIntosh, sort of does address this. They actually looked at that argument. And what the argument that was made by the city in that case is that, you know, they could call us at any time and they could say, you know, if you've got an issue, come talk to us, we'll figure it out. And in this case, I think it went further than that. The city actually posted a notice on this door, and that addresses some of the issues as to the plaintiff and what type of notice was provided. It's not just that it was mailed out. It's not just that they had the conversation with the attorney. They went out to the structure, posted a notice, said, you know, get your stuff out in five days. And Krug then went to the housing court attorney and said, you know, if you do want to do this, if you do want to say this in housing court, here's how you do it, in Article 78 proceeding. And if you look at the back and forth for the subsequent matters between Judge Carney and Burberry, he makes reference to, obviously, Burberry, you know how to address this if you want to. In this case, in these unique circumstances, I believe that pre-deprivation, post-deprivation was addressed through the presence of an Article 78 proceeding, putting aside the fact that we are arguing that there was an emergency in this circumstance, and I don't believe there was a question of fact. I think in this case, because of the flexible concept of due process, it was provided. All right. Thank you. Thank you. Any other questions, Your Honor? No. Okay. I'm sorry, just before you sit down, just one question. At what point in time do you think an emergency had sufficiently crystallized to permit demolition? I think in 2015 when Judge Cardi ordered that demolition be done of the property, and I think it existed from that point on, and it only got worse, both through the condition of the property and through the fact that someone died there. Thank you. Thank you, Your Honor. Mr. Cantillo, you have two minutes in rebuttal. Thank you, Your Honor. Just a couple of points. You can't have your cake and eat it, too. You can't say that there's an emergency and then just wait for however long and then just decide to demolish the property when the commissioner seems fit. That's clear from the case law. It's clear from Burtnick's, where three months was enough to call into question whether there was an emergency. Well, conditions were found, they were documented, and they weren't addressed. Well, I would have two points to that. First, there is an exigency and eminence requirement to the emergency because when there's time to provide an inspection or provide a notice or a pre-deprivation hearing, then that's what due process requires. It's cases like Catanzaro where a car runs into a house and it's in danger of falling immediately and they respond. You're not contending, are you, that they should have demolished because of the declaration of an emergency, they should have torn down the house earlier? No, I'm suggesting I don't think that this court has to take a position on whether the house should have been torn down or not. If it happened after a – this is about the process. If the city had decided to demolish the house after a hearing. If there's an emergency being declared, what more process do you need? Well, there has to be a true emergency, and here the facts just don't support that there was. And one of the things that opposing counsel said is if he had come in and told us, well, here's the work I had done, well, that's exactly the reason why you have a pre-deprivation hearing so he can come in and say, here's the work I've done. Because the architect who provided deposition testimony reviewed the property and inspected the property and said, no, there are no structural – Why wouldn't the addition of the overdose death push it over the line, that this shows that there are people engaged in criminal activity maybe inside a house that is structurally deficient? Why isn't that enough to change the circumstances? I think the record's unclear on exactly where and how the overdose occurred, whether it was in the building or outside of it. What the record is clear on is there was one needle found. And I'd point out again – Well, the record's clear. There was a dead body in the building that died of an overdose. But the issue remains – You're not going to have a movie film of that. Right. The issue remains, then, why wait one month if it's an emergency to wait one month? And for something that is not a structural – It's the city of Buffalo, a busy urban community, and this is not the only problem on these folks' plate. And they had to put out a bid. Didn't they have to put out a bid for the demolition too? Wasn't that part of the timing or no? But perhaps what's telling is Commissioner Comerford's testimony that, well, had I known that there was a pre-deprivation hearing in October, I would have just waited. I would not have ordered this emergency demolition. Was the hearing delayed at all because the fact that your client was incarcerated? The hearing was scheduled for October, I believe, 15th of 2019. And so he was locked up for what period of time? Through that time period. I don't know exactly when. When was he locked up? When did he go in? I can find that for you, Your Honor. About 18 months, wasn't it? That's right. I believe it was late 2018 to 2020. And when was the hearing scheduled? October of 2019. Well, after he was locked up. While. While. He would have had to send a lawyer to the hearing. Correct, Your Honor. He what? Would have had to send a lawyer to the hearing. He wasn't going to the hearing because he was locked up. Okay. Was that a factor that the city took into account? That, you know, the owner can't really meaningfully participate in this process because it's unfair to require the owner to meaningfully participate in this process because he's locked up. Well, he could have participated through his representative. There's nothing that I've seen in the record that suggests that that was part of their calculus. I see my time has run up. If I could just close with one point regarding PEMBAUER and the final decision-maker authority. What PEMBAUER stands for is that somebody has a final decision-making of something that is clearly their province. You know, not every decision that Commissioner Comerford makes is the policy of the city of Buffalo. But surely when it comes to emergency demolitions where he decrees these houses to be demolished and then it's demolished, decisions don't get more final than that. So he is a final, under Monell, this represents policy. Thank you, Your Honor. Thank you both for a reserve decision.